M. E. GRUBER, INC., AND M. E. GRUBER v. E. W. EUBANK, TRUSTEE ET AL.

(Filed 22 May, 1929.)

1. **Deeds and Conveyances C d—Reservation in deed in this case held too vague to allow parol evidence of identification, and is void.**

   A reservation in a deed in the chain of title to the *locus in quo*, contained in the description "thence south 5 degs. east, running on the west side of the creek 7 poles to a stake on the west side of the creek; thence same course 1 pole to a stake, reserving at all times the full and entire use of the distance of 40 yards of said creek" is held too vague and indefinite a description to admit of identification by parol evidence, and is not contrary to a covenant in a later deed against encumbrance.

2. **Easements A a—Intermittent and permissive use of paths on land does not create easement thereon.**

   Evidence that paths on a tract of land were intermittently and permissively used by tourists and others is insufficient to create an easement on the lands.

CLARKSON, J., not sitting.

CIVIL ACTION, before *Schenck, J.,* at November Term, 1928, of HENDERSON.

On 15 October, 1836, Charles Baring executed and delivered a deed to Marie Joseph Gabriel Xaviar DeChoisel for a large body of land covering the land in controversy. The said deed shows the following reservation: "Thence south 5 degs. east, running on the west side of the creek 7 poles to a stake on the west side of the creek; thence same course 1 pole to a stake, reserving at all times the full and entire use of the distance of 40 yards of said creek for the use of my Flat Rock settlement and that it may not be directed (diverted) from the same." It is contended that this language created the Jerusalem Trail, situated in some places about 40 yards from the creek and running across plaintiff's land for a distance of approximately one-third of a mile.

GRUBER *v.* EUBANK.

The land by mesne conveyances became the property of R. C. Seigling. On 11 January, 1926, R. C. Seigling and wife conveyed to M. E. Gruber a part of said land, containing 112 acres, more or less, without reservation. Gruber executed a deed of trust to the defendant, Eubank, to secure the payment of purchase money notes amounting to approximately $100,000. The entire purchase price was $150,000. The title to the property was investigated and an abstract thereof furnished to Gruber at the time of the purchase. In the meantime Seigling died and his wife, Lucile L. Seigling, qualified as executrix of his will. At the time the first note fell due Gruber procured an extension of time from Mrs. Seigling. Payment not having been made according to contract, the defendant, Eubank, under power contained in the deed of trust, advertised the property for sale. Thereupon the plaintiffs secured a restraining order, alleging in substance that they had agreed to pay $150,000 for said property for the reason that he was desirous of acquiring a private estate which was excluded from highways and traffic, and thus protected from intrusion of outsiders. Plaintiffs further alleged that the language in the deed from Baring to DeChoisel and subsequent conveyances of said land constituted an easement upon their land, which said easement was an encumbrance upon the title and greatly depreciated the value of their property, for that the public had the right to pass across the land.

The evidence tended to show that there was a walkway of some kind known as the Jerusalem Trail, which was located across plaintiff's land on the west side of the creek, and running from the Little River road on the west side of the creek until it strikes Idlewild Drive. At this point the trail forks and one part turns east and runs along said drive, and the other continues in the direction of a church known as St. John's in the Wilderness. This walkway or trail appeared to be forty yards wide and situated about one hundred and twenty feet west of the creek at some points, although at other points it was more than one hundred and twenty feet west of the creek. The trail had been obliterated in some places, and at other places it was fairly plain. There was evidence tending to show that a cow pasture and a hog pasture had been built across this trail, but that there were gates or stiles in the fence many years ago. "In spots the trail is grown up in blackberry sprouts, timber and things like that pretty thick. . . . The trail stops near a wire fence, and you go into a field after it leaves the Gruber land. . . . There is a field all plowed and cultivated part of the way, and there is no indication of a trail. . . . I went on the west side of the creek to locate a 40-yard strip because about forty years ago I saw a stile across the fence, and old people said it was where Jerusalem Trail was." There was evidence that from time to time within the past twenty years people had been seen on the land, and perhaps in some part of this trail

where it had not been obliterated. The field, referred to by the witnesses, was cleared and put into cultivation about sixteen or seventeen years ago. The entire tract was under fence about forty years ago. One witness for plaintiff testified as follows: "There were paths all over that place, and people would travel them pretty generally as they wanted to. They went into the Jerusalem path more than others. It seemed it was a more public way. It was more in the way of travel." Another witness testified: "My first acquaintance with that trail was about four years after the Civil War. Have traveled over that trail and have seen other people travel over it. The people used it when they wanted to. It was a public passway. I saw the Memmingers and Middletons going through there. . . . Bard Middleton owned it when I first knew it. The C. G. Memminger place . . . is right over on the other side of the Little River road. . . . The time I knew of those people going through there was about the time of the Civil War. . . . There has been a fence around the whole place, the Seigling place, for the last thirty or forty years."

Another witness for plaintiff testified he worked on the place from 1907 to 1912, and that he would see people walk through there, and that Mrs. Seigling said to let anybody go through the place if they did not molest anything. He further testified: "There were other paths going through the property in addition to the Jerusalem Trail. People used those trails like that and this Jerusalem Trail  They used them when they wanted to make a short cut. . . . There never was much travel through there. The only thing was that people just took advantage of the place and went through when they wanted to go through just like they did any other place. . . . Those plantations are large, and most of the people who walk through there were Southern people. They were just there in the summer time. It was mostly summer people and boarders up here that wént there."

Another witness testified: "People generally have been passing through the Jerusalem Trail for twenty-five years at least. . . . There are paths all through that place." Mr. Seigling "told me just to let them go anywhere through those paths as long as they did not interfere with or destroy the shrubbery." Mr. Seigling put the stiles there "for his men only." "Lots of people go through there, and some people go through that other path on the Seigling place."       .

The evidence further tended to show that the Flat Rock settlement was situated on the east side of the creek and that the line dividing the two tracts of land struck the elbow in the creek, crossing the creek at the elbow. This elbow constituted just forty yards of the creek, and the defendant contended that the language in the deed referred to was intended to reserve this bend in the creek for watering purposes for the

Flat Rock settlement because this elbow was the only portion of the creek east of the dividing line of the two tracts. The defendant further contended that this theory is borne out by the fact that the words in the deed, constituting the alleged reservation, occur immediately after the call for a stake on the west side of the creek, thus emphasizing the intention of the parties to reserve a part of the creek itself rather than a strip of land forty feet wide and one-third of a mile long on the west side of the creek.

At the conclusion of the testimony the trial judge sustained the motion of nonsuit, and the plaintiff appealed.

*Arledge, Taylor & Crowell for plaintiffs.*
*Buist & Buist, Ewbank, Whitmire & Weeks and Rollings & Smathers for defendants.*

BROGDEN, J. Two questions are presented by the record: ·

1. Does the language in the deeds, constituting plaintiff's chain of title, create an easement across the said land known as the Jerusalem Trail?

2. If not, has such easement to said strip of land, known as the Jerusalem Trail, been acquired by prescription?

It must be observed at the outset that no person or group of persons is claiming an easement across plaintiff's land or attempting to assert any right to use that strip of land described in the case as the Jerusalem Trail. The plaintiff has brought this suit against the defendants, alleging that the language in the deed constitutes an easement, which is an encumbrance upon his title, and therefore resulting in a breach of the covenant in the deed from the defendant to the plaintiff, and thus entitling the plaintiff to a rescission of the contract for the purchase of the land or for damages. The language of the deed creating the alleged easement occurs in the description of the property and is as follows: "Thence south 5 degs. east, running on the west side of the creek 7 poles to a stake on the west side of the creek; thence same course 1 pole to a stake, reserving at all times the full and entire use of the distance of 40 yards of said creek for the use of my Flat Rock settlement, and that it may not be directed (diverted) from the same." This language is found in the deed from Baring to DeChoisel and in every deed constituting the chain of title under which Seigling claims, though it is not inserted in the deed from Seigling to the plaintiffs. Baring, at the date of the deed in 1836, owned a large boundary of land. An examination of the description of the property from Baring to DeChoisel discloses that the reservation occurs as a part of the description of the land. It further appears from plats filed in the cause that the line of the land

conveyed by Baring to DeChoisel was entirely on the east side of the creek and only touched the creek at the elbow. This elbow of forty yards, therefore, was the only part of the creek left on the Flat Rock side of the creek. In other words, a person living or owning land on the Flat Rock side of the creek would only touch the creek at the elbow without trespassing upon the DeChoisel land, which is now the land in controversy.

The law recognizes nine methods of creating or establishing easements. Mordecai Law Lectures, Vol. 1, 464-471. However, in the case at bar the easement in controversy arises either from the reservation in the deed or by prescription. An easement, of course, is an interest in land, and, if it is created by deed, either by express grant or by reservation, the description thereof must not be too uncertain, vague and indefinite. *Waugh v. Richardson,* 30 N. C., 470; *McCormick v. Monroe,* 46 N. C., 13; *Patton v. Educational Co.,* 101 N. C., 408, 8 S. E., 140; *S. v. Suttle,* 115 N. C., 784, 20 S. E., 725. See, also, *Bissette v. Strickland,* 191 N. C., 260, 131 S. E., 655, and *Bryson v. McCoy,* 194 N. C., 91, 138 S. E., 420; *Coastal Land and Timber Co. v. Eubank,* 196 N. C., 724.

The principles of law relating to easements are clear enough and plain enough, but the chief difficulty arises in construing or interpreting the language contained in the deed. A reservation of "a distance of 40 yards of said creek . . . and that it may not be diverted from the same" is too ambiguous and uncertain to create a public way for one-third of a mile across a tract of land. The identity of such an interest in land would of necesssity rest in conjecture and speculation, and we therefore hold that the language in the deed was not sufficient to identify the easement asserted by the plaintiff.

The second phase of the controversy involves the question as to whether the Jerusalem Trail by virtue of use amounted to a public way across the lands of the plaintiff. There is evidence in the record of the existence of the Jerusalem Trail about forty or forty-five years ago. There is further evidence that within the past ten years people have been seen walking in portions of this trail, and that in former years numbers of people used the walkway for going to church or for other purposes. However, it further appears that forty years ago the entire tract of land was under fence, and that subsequently a cow pasture and a hog pasture enclosed by a wire fence had been constructed across this area, and that while stiles had been erected, they had been built for the exclusive use of employees of the owner. Indeed, the testimony discloses that summer boarders and sightseers were the persons most frequently seen upon the premises in recent years.

Mere user is not sufficient to create such an easement as contended for by the plaintiffs. *Boyden v. Achenbach,* 79 N. C., 539; *Snowden v. Bell,* 159 N. C., 497, 75 S. E., 721; *S. v. Norris,* 174 N. C., 808, 93 S. E., 950; *Nash v. Shute,* 184 N. C., 383, 114 S. E., 470. The legal essentials for creating an easement by prescription are thus stated in 9 R. C. L., 772: "To establish an easement by prescription it must be: first, continued and uninterrupted use or enjoyment; second, identity of the thing enjoyed; third, a claim of right adverse to the owner of the soil, known to and acquiesced in by him." *Draper v. Conner,* 187 N. C., 18, 121 S. E., 29; *Durham v. Wright,* 190 N. C., 568, 130 S. E., 161.

The evidence in the case at bar, viewed in a light most favorable to the plaintiffs, tends to show intermittent and desultory use of portions of that strip of land known as the Jerusalem Trail. There is no suggestion of any claim of right by any person or group of persons. In the last analysis it appears that neighbors, sightseers and summer boarders from time to time walked in this trail at places where it was not enclosed by fence or grown up in bushes and timber or obliterated by cultivation. There is no evidence tending to establish the existence of such an easement, and the judgment of nonsuit was properly entered.

Affirmed.

CLARKSON, J., not sitting.